## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **No. 1:20-cr-245** |
| | : | |
| **v.** | : | **(Judge Wilson)** |
| | : | |
| **EVAN WECHSLER,** | : | |
| **Defendant** | : | **Electronically filed** |

## <u>GOVERNMENT SENTENCING MEMORANDUM</u>

This case is the story of someone whose lifestyle and spending choices were wildly out of proportion with his means and who turned to crime in order to support that lifestyle and spending choices. Defendant Evan Wechsler's actions put a large financial institution at risk and caused it almost $6.3 million in financial losses. While it is true that defendant has admitted guilt and taken steps toward cooperation, he provides no basis for the imposition of probation, which he argues for. The Guidelines sentencing range for his offense is 63 to 78 months, and the Court should impose a sentence at the low end of this range. This sentence appropriately fits with the Section 3553(a) factors: it credits defendant for his timely acceptance of responsibility without sending a message that reckless behavior by people in fortunate positions will be met with an official shrug of the shoulders.

1

## PROCEDURAL AND FACTUAL BACKGROUND

Defendant's sentencing memorandum details the manner in which he orchestrated an elaborate check-kiting scheme spanning several years and multiple financial institutions. See Doc. 34 at 8–10. As defendant concedes, this scheme grew to massive proportions. *Id.* By May 2017, an account with BB&T had received more than $118 million in fraudulent "credits" and had been debited over $95 million. Over the course of just five days in late May 2017, over $29 million was deposited into accounts belonging to defendant's various affiliated companies. *Id.* at 9. Then suddenly the music stopped, and victim BB&T realized that defendant's actions had caused it nearly $6.3 million in losses. *Id.* at 8. Within weeks, BB&T filed a lawsuit against defendant, defendant's father, various companies controlled by defendant and his father, and other individuals affiliated with these companies. *Id.* at 11. As part of his settlement with BB&T, defendant admitted that the bulk of the allegations of check-kiting against him were true and correct. *Id.* at 13.

The Supreme Court and Third Circuit have previously explained check-kiting by way of the following illustration:

> The check kiter opens an account at Bank A with a nominal deposit. He then writes a check on that account for a large sum,

2

such as $50,000. The check kiter then opens an account at Bank B and deposits the $50,000 check from Bank A in that account. At the time of deposit, the check is not supported by sufficient funds in the account at Bank A. However, Bank B, unaware of this fact, gives the check kiter immediate credit on his account at Bank B. During the several-day period that the check on Bank A is being processed for collection from that bank, the check kiter writes a $50,000 check on his account at Bank B and deposits it into his account at Bank A. At the time of the deposit of that check, Bank A gives the check kiter immediate credit on his account there, and on the basis of that grant of credit pays the original $50,000 check when it is presented for collection.

By repeating this scheme, or some variation of it, the check kiter can use the $50,000 credit originally given by Bank B as an interest-free loan for an extended period of time. In effect, the check kiter can take advantage of the several-day period required for the transmittal, processing, and payment of checks from accounts in different banks.

*United States v. Shaffer*, 35 F.3d 110, 111 n.1 (3d Cir. 1994) (citing

*Williams v. United States*, 458 U.S. 279, 281 n.1 (1982)).

By the time federal law enforcement approached defendant

regarding the same conduct that led to his settlement with BB&T,

multiple former employees had already confirmed and described his role

as the leader of this check-kiting scheme. This is worth mentioning

because defendant cites his timely and complete acceptance of

responsibility as a basis for leniency. Doc. 34 at 3. In reality, defendant

had at best unappealing alternatives to accepting a plea agreement

because the conduct at issue had already been so well established

through the BB&T suit and subsequent investigative steps by law

enforcement.

## ARGUMENT

At issue in this sentencing hearing is not what Evan Wechsler did

or the type or degree of harm to victims. Those facts are beyond dispute.

Furthermore, defendant does not appear to argue, in contravention of

case law, that his repayment of losses to BB&T after his scheme was

discovered reduces the applicable loss figure for guidelines sentencing

range purposes. Rather, he believes that his "acceptance of

responsibility, total repayment of the victim's loss of the principal of

$6,290,153.90 and his ongoing cooperation with the government"

collectively justify a downward departure pursuant to 18 U.S.C. §

3553(a), and he argues that a probationary sentence is sufficient but not

greater than necessary under the circumstances. Doc. 34 at 4.

It goes without saying that defendant deserves credit for

acceptance of responsibility; however, that is already built into the

guidelines: without that three-point reduction, he would be facing a

sentencing range of 87 to 108 months—an increase of two years at the low end and 30 months at the high end.

Wechsler's repayments to BB&T present a more complicated issue. While it is true that Defendant has paid BB&T approximately $2.3 million since entering a settlement agreement in August 2017 (and nearly $6.3 million total), *id.* at 13, 18, it is also the case that he sought and received BB&T's agreement to an extension of nearly three additional years to complete the payments owed to them. These payments were originally supposed to be completed in August 2019; the deadline was extended to June 2022 because defendant could not come up with the money. *Id.* at 12–13. In other words, nearly four years after his criminal activity was uncovered, he still has another whole year of repayments to go.[1]

These facts are relevant because defendant argues that the Court should impose a probation sentence in order to allow him to continue working to support his family and pay back what he still owes to BB&T. *Id.* at 17–18. In other words, he contends that probation is appropriate

---

[1]   Defendant does not say in his sentencing memorandum how much more he still owes. Yet, as the Court knows, defendant has insisted that he cannot accelerate his repayment schedule, which currently extends to June 2022.

because of "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). But it is clear that restitution is not yet complete, at least in significant part, because of defendant's own extravagant spending since May 2017. His spending patterns also bear directly on "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Put simply, this evidence sheds light on his motives for doing what he did.

Defendant maintains that his check-kiting activities were motivated by concern for the several hundred employees who worked for his companies and the many additional people who relied on those employees' paychecks for survival. *See, e.g.*, Doc. 34 at 15. In fact, he goes so far as to say that he did not benefit from the check-kiting scheme other than through "payment of his salary and through the continuance of the Company's operations." *Id.* at 16. This statement is a non-sequitur, as it ignores the clear link between the scheme and his compensation. During the period of 2014 to 2017 when defendant was engaged in massive check-kiting, his company was operating at a loss. *Id.* at 1. This check-kiting scheme inflated his company's outward fiscal health, thus allowing him to continue receiving the generous salary he

6

made as CEO. As proof of the company's role in propping up his lifestyle, Wechsler had an adjusted gross income of about $388 thousand in 2017—the year that the check-kiting scheme unraveled. By 2019—his last year as CEO of J.P. Donmoyer, Inc. and F.T. Silfies, Inc.—his income had shrunk to about $146 thousand. Doc. 27, ¶ 70. Once the bubble burst on defendant's check-kiting scheme, his income dropped rapidly.

Even when it comes to vivid examples of extravagance, defendant still tries to contend that greed was not a motive and that he did not personally benefit from check-kiting. Defendant claims, for instance, that the Cape Cod vacation home that he purchased in August 2017 for over $1.5 million was obtained through "funds unrelated to the Trucking Companies" whose bank accounts were used for kiting. Doc. 34 at 16; Doc. 27, ¶ 62. Putting aside the lack of support provided for this statement, this luxury home purchase is a microcosm of the poor decisions defendant has made and the reason for those poor choices. When he purchased this house in August 2017, he was fully on notice that his scheme had been uncovered. Under his agreement with BB&T in August 2017, he knew that still owed approximately $2.4 million in

check-kiting losses. To any person whose goal was to accept responsibility and turn over a new leaf, getting sued by BB&T for over $6 million would have served as an alarm bell that he needed to alter his life in a drastic and fundamental manner.

Instead, Wechsler apparently believed that his life would remain largely unchanged, as he closed on the home purchase in early August 2017—the very same month that he signed an agreement with BB&T admitting to carrying out a massive check-kiting scheme. Even now, he cannot bring himself to acknowledge that he was motivated by greed. Instead, he claims that the purchase of his luxury vacation home was driven by a desire not to disappoint his wife and children. Doc. 34 at 16.[2] The government doesn't doubt that defendant loves his family, but that claim is candidly a cop-out.

---

[2] According to the PSR, the fair market value of the home is about $2.4 million. Doc 27, ¶ 62. According to online sources, it is between $2.7 million and $3.2 million. *See* https://www.zillow.com/homedetails/24-Nameless-Ln-Chatham-MA-02633/56776478_zpid/; https://www.redfin.com/MA/Chatham/24-Nameless-Ln-02633/home/77377640. Given defendant's financial predicament and the seller-friendly real estate market over the past year, it is telling that defendant did not sell this property earlier. It appears to reflect an assumption that the Court would agree to delay his sentencing for months to allow him to complete repayments to BB&T on his preferred timetable, thus obviating the need for life-changing measures like selling a luxury vacation home.

The home in Cape Cod is not an isolated example. In April 2018, less than a year after purchasing the vacation home, defendant and his wife purchased a luxury home to use as their primary residence in Chevy Chase, Maryland. This house cost just under $2 million and has since grown to about $2.3 million in value. Doc. 27, ¶ 61. Since the check-kiting scheme unraveled, defendant has also leased at least three different vehicles: a 2019 Land Rover Range Rover with a monthly payment of $2,259.84, a 2019 Volvo XC60 with a monthly payment of $616.28, and a 2018 Jeep Wrangler with a monthly payment of $619.98. Doc. 27, ¶ 66. The starting market values of these vehicles when new was approximately $90,000, $41,000, and $38,000, respectively.[3] In other words, defendant decided to prioritize cars over repayment of his debts to BB&T. He made this choice despite the fact that on June 7, 2019, he had to enter a forbearance agreement with BB&T because he was unable to complete payments by August 31, 2019, as he had agreed to do. Doc. 34 at 12.

It has long been clear to defendant that this standard of living was unsustainable. His monthly expenses exceed his monthly income by

---

[3]   These prices were taken from Car and Driver. https://www.caranddriver.com/.

more than $12 thousand. Doc. 27, ¶ 60. Collectively, payment for his

two homes and three vehicles amounts to about $20 thousand per

month. *Id.* As of February 2021, defendant was more than $25 thousand

past due on his primary residence mortgage and at least one payment

late on each of his leased vehicles. Doc 27, ¶ 69.

Regarding defendant's underlying conduct, there is at least one

factual claim that requires correction. Defendant claims that "[h]e

thought the Company would improve, that they just needed more time"

and furthermore that "[a]s the issue grew, [he] lost control of the

situation, was unaware of its magnitude and was unable to easily

rectify it." Doc. 34 at 15. While it is clear that he lost control of the

situation, and he may have been unable to "easily rectify it,"[4] it is not

the case that he was unaware of its magnitude. Defendant was the one

directing the entire scheme. In his own words, . . .

> . . . [e]mails from Evan to Messrs. Silfies and Kretz directed those
> individuals as to how much money was to be deposited at each
> bank. Evan coordinated the deposits and indicated to Messrs.
> Silfies and Kretz that he wanted half of the money deposited in
> the morning and the other half in the afternoon, using multiple
> bank branches. To facilitate the deposits, Evan mailed, via
> overnight courier, a package of approximately ten (10) to fifteen

---

[4]   Although, in fairness, one way to begin rectifying the situation would have been
      to stop engaging in check-kiting, which went on for four years.

(15) checks. These checks were sent from Evan in Bethesda to
Messrs. Silfies and Kretz in Ono. In the end of the scheme, each
check was written for at least $200,000 to $250,000.

*Id.* at 9. Anyone writing multiple checks each day for $200,000 to

$250,000 cannot credibly claim to be unaware of the magnitude of the

situation. What's more, it is again striking that someone could engage

in such activity, get busted, and then emerge seemingly unaffected,

closing on a luxury vacation home just a couple months later, and

buying another luxury home only months after that.

Defendant cites no other case in which the ringleader of a check-

kiting scheme—let alone one of this size—was sentenced to probation.

In fact, a cursory review of prior cases shows that lengthy sentences

within the guidelines range are the norm in this area. *See United States*

*v. Jimenez*, 513 F.3d 62, 90–91 (3d Cir. 2008) (Imposition of 40-month

sentence for defendant Nieves' bank fraud crime related to check-kiting

scheme was reasonable because (1) the sentence was below the middle

of the applicable advisory guidelines range, (2) the court discussed the

statutory sentencing factors and considered issues raised by defendant,

and (3) the court considered the length of the conspiracy, the position

of trust held by the defendant, and the seriousness of the offense); *United*

*States v. Swanson*, 360 F.3d 1155 (10th Cir. 2004) (sentencing defendant with an offense level of 24 to a prison term of 51 months for approximately $73 million in kited funds resulting in overdraft loss of about $522,000).

More importantly, giving defendant probation would not "reflect the seriousness of the offense, [] promote respect for the law, [or] provide just punishment for the offense," nor would it "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(a)-(b). In fact, it would send entirely the wrong message to other potential criminals out there, particularly fortunate individuals like Evan Wechsler who might be contemplating white-collar offenses like the one at issue here. A probation sentence would send a loud and clear invitation to these individuals that even if they get caught, they can just pay the money back—on their own leisurely timetable, while enjoying the comforts of a high-class lifestyle—and they will be permitted to move on with their lives. A sentence of this kind could not be considered sufficient or just under 18 U.S.C. § 3553(a).

## CONCLUSION

For the reasons stated above, the Court should impose a sentence at the low end of the applicable guidelines sentencing range.

Dated: June 11, 2021                          Respectfully submitted,

                                              BRUCE D. BRANDLER
                                              Acting United States Attorney

                                              /s/ Ravi R. Sharma
                                              Ravi Romel Sharma
                                              Assistant U.S. Attorney
                                              VA 82627
                                              228 Walnut Street, Suite 220
                                              P.O. Box 11754
                                              Harrisburg, PA 17108
                                              Tel: (717) 221-4482
                                              Fax: (717) 221-4493
                                              ravi.sharma@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 11, 2021, I served the foregoing document by

electronic service on the following individual:

Jordan Cunningham, Esq.
jdc@cclawpc.com

/s/ Ravi R. Sharma
Ravi Romel Sharma
Assistant U.S. Attorney